# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CT-00498-SCT

*ELIZABETH JOY (SELBY) GIANNARIS*

*v.*

*STEPHEN ANDREW GIANNARIS*

## ON WRIT OF CERTIORARI

DATE OF JUDGMENT: 08/17/2004
TRIAL JUDGE: HON. CARTER O. BISE
COURT FROM WHICH APPEALED: HARRISON COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT: WENDY C. HOLLINGSWORTH
DUSTIN NORMAN THOMAS
ATTORNEY FOR APPELLEE: WILLIAM E. TISDALE
NATURE OF THE CASE: CIVIL - CUSTODY
DISPOSITION: REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART - 07/19/2007
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     On July 10, 1994, Stephen Andrew Giannaris ("Stephen") and Elizabeth Joy (Selby) Giannaris ("Elizabeth") were married in California. One child, S.G., was born of the union in 1998. On July 30, 2002, a "Final Judgment of Divorce" between Stephen and Elizabeth was filed in the Chancery Court of Harrison County. Incorporated into the final judgment was the "Child Custody, Support, and Visitation Settlement Agreement" ("agreement") executed by Stephen and Elizabeth. The agreement provided Elizabeth with "paramount physical control and custody of [S.G.,]" while granting Stephen liberal visitation. The

following year, Stephen filed a "Complaint for Contempt, Modification and Other Relief" seeking primary physical custody of S.G. Following a hearing, the Chancery Court of Harrison County modified custody and granted Stephen primary physical custody. Specifically, the chancellor determined that the substantial visitation provided by the agreement, combined with the fact that Stephen, a weather forecaster for the United States Navy, had been transferred to San Diego, California, "constituted a substantial change in circumstances." Moreover, the chancellor found that Elizabeth's "refusal to communicate and cooperate with [Stephen] and [her] attitude toward [Stephen's present wife, Anita] constitutes an adverse circumstance." The chancellor then conducted an *Albright*[1] analysis and found that the factors favored Stephen. The Court of Appeals affirmed the chancellor's ruling. *See Giannaris v. Giannaris*, 2006 Miss. App. LEXIS 668 (Miss. Ct. App., Sept. 12, 2006).

¶2.    This Court granted Elizabeth's petition for writ of certiorari, which raised the following issues: (1) the trial court erred in basing modification of child custody on the relocation of the non-custodial parent; (2) the trial court employed an erroneous legal standard for modification of child custody by allowing the "material change in circumstances" and the "adverse affect [sic]" to be based on unrelated matters; (3) the trial court erred in relying upon isolated events which were not likely to continue into the foreseeable future to support a modification of custody; and (4) the trial court and Court of

---

[1] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

2

Appeals failed to employ a *Daubert*[2] analysis before considering the testimony of clinical social worker Pat Gunkel, and the Court of Appeals failed to address all of the requirements of Miss. R. Evid. 702. After due consideration, this Court finds that both the chancellor and the Court of Appeals erred. The chancellor conflated isolated events which resulted in the application of an erroneous legal standard, and abused his discretion in admitting the testimony of Gunkel. Accordingly, their judgments are reversed, and we render judgment, awarding primary physical custody of S.G. to Elizabeth, and remand the support and visitation issues to the chancery court for determination.

## FACTS AND PROCEDURAL HISTORY

¶3. On July 10, 1994, Stephen and Elizabeth were married in California. One child, S.G., was born of the union in 1998. Stephen and Elizabeth were separated on September 24, 2001. The couple filed for divorce on May 6, 2002. They entered into a "Child Custody, Support, and Visitation Settlement Agreement." In pertinent part, the agreement provided for joint legal custody of S.G., with Elizabeth receiving "paramount physical control and custody of [S.G.]" and Stephen having liberal visitation.[3] The agreement concluded by stating, "[t]his Agreement can, may and should be incorporated into a Final Decree of Divorce herein . . . and both parties request the Court to agree with same." On July 30,

---

[2] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L. Ed. 2d 469 (1993).

[3] Specifically, Stephen's visitation rights included: the first and third weekend of each month; every Tuesday and Thursday; three weeks during S.G.'s summer vacation; every other Christmas, Spring Break, and Thanksgiving; and every Father's Day.

2002, the "Final Judgment of Divorce" was filed in the Chancery Court of Harrison County. Incorporated into the final judgment was the agreement executed by Stephen and Elizabeth.

¶4.    Three weeks after the divorce was finalized, Stephen married his present wife, Anita. Stephen and Anita had been involved in an extramarital affair prior to Stephen and Elizabeth's divorce, of which Elizabeth initially was unaware. Elizabeth ultimately learned of the affair. As a result of the affair and Stephen's subsequent marriage to Anita,[4] animosity existed between Elizabeth and Anita.[5] However, Stephen conceded that visitation was mostly without incident and in conformity with the provisions of the agreement. Furthermore, the record reveals that S.G. was in good physical health and had a normal appetite. Regarding other incidents, Elizabeth conceded that on one occasion she had refused to swap days with Stephen and instead kept S.G.[6] and that she initially did not include Anita's name on the day-care pickup list.

¶5.    On October 14, 2003, Stephen filed a "Complaint for Contempt, Modification and Other Relief" seeking primary physical custody of S.G. primarily on the basis of an alleged

---

[4]Which wedding ceremony S.G. attended out-of-state without Elizabeth's knowledge.

[5]Stephen testified that Elizabeth called Anita a "dirty whore" in S.G.'s presence on one occasion.

[6]Stephen testified:

A. . . . Elizabeth had requested that she get a week of vacation with [S.G.]. I attempted to trade the days with her in order to give that week, but she refused to trade the Tuesday and Thursday, and just assumed that she'd keep those days.

Q. Did she keep the child on those days?

A. Yes, she did.

4

adverse effect upon her from the possibility of Elizabeth's home being foreclosed. The chancery court granted Stephen permission to respond to unanswered requests for admissions, and to amend his complaint. On March 9, 2004, Stephen filed an "Amended Complaint for Contempt, Modification and Other Relief," again seeking primary physical custody of S.G. The amended complaint alleged for the first time, "[t]hat Elizabeth has engaged in a course of conduct that has resulted in a substantial and material change in circumstances[,]" and then listed a series of factors which he alleged had an adverse effect on S.G.

¶6.     At the August 17, 2004 hearing, the chancellor found that the substantial visitation provided by the agreement, combined with the fact that Stephen, a weather forecaster for the United States Navy, had been transferred to San Diego[7] "constituted a substantial change in circumstances." Moreover, the chancellor found that Elizabeth's "refusal to communicate and cooperate with [Stephen] and [her] attitude toward [Stephen's present wife, Anita] constitutes an adverse circumstance[,]" which the chancellor used to initiate an *Albright* inquiry. After weighing the *Albright* factors, the chancellor concluded that "it would be in the best interest of [S.G.] . . . that custody be transferred to [Stephen]." On September 9, 2004, a judgment to that effect was entered by the chancery court. Elizabeth's subsequent "Motion to Set Aside, Reconsider and/or to Alter or Amend Judgment or for a New Trial" was denied by the chancery court and, thereafter, she timely filed notice of appeal.

_____

[7]Stephen anticipated being in San Diego for "[a]t least three years . . . ." Stephen also testified that he anticipated being deployed every six months for periods ranging between five days and two months.

¶7.    The Court of Appeals affirmed the chancellor's ruling. *See **Giannaris***, 2006 Miss. App. LEXIS at 668.  A majority of the Court of Appeals erred in rejecting Elizabeth's argument that "the change in circumstances and the adverse effect cannot be based on two entirely differen[t] things." *Id*. at *9.  The Court of Appeals majority opined that:

> [a]lthough the chancellor *did not specifically state* that Elizabeth's failure to cooperate and communicate with Stephen and her attitude toward Anita was a change in circumstances, *the facts imply that* this "adverse circumstance" constituted a change in circumstances that arose after the entry of the divorce. Pre-divorce, neither communication and cooperation regarding visitation, nor Stephen's marriage to Anita was an issue.  Thus, Elizabeth's behavior was necessarily a change in circumstances that occurred after the original custody determination.  Moreover, the chancellor determined that her behavior was adverse to the best interest of the child.

*Id*. at *9-10 (emphasis added).  While conceding that Stephen's move was foreseeable at the time of the divorce, the Court of Appeals deduced that "the chancellor did not modify custody based on Stephen's move.  In addition to Stephen's move, the chancellor considered Elizabeth's behavior since the divorce (i.e., her failure to cooperate and communicate with Stephen and her attitude toward Anita)." *Id*. at *10-11.  In so concluding, the Court of Appeals ignored the chancellor's finding "that Stephen's move to San Diego constituted a 'substantial change in circumstances.'" *Id*. at *8.  After Elizabeth's motion for rehearing was denied by the Court of Appeals, she filed her petition for writ of certiorari with this Court. In granting Elizabeth's petition, this Court now considers (1) whether the chancellor erred in modifying custody and granting Stephen primary physical custody of S.G. and (2) whether the trial court employed a proper analysis under Miss. R. Evid. 702 as to witness Gunkel.

## ANALYSIS

### I. Whether the chancellor erred in modifying custody and granting Stephen primary physical custody of S.G.

¶8. When this Court reviews domestic relations matters, our scope of review is limited by the substantial evidence/manifest error rule. *See R.K. v. J.K.*, 946 So. 2d 764, 772 (Miss. 2007) (citing *Mizell v. Mizell*, 708 So. 2d 55, 59 (Miss. 1998)). Therefore, we will "not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Id*.

¶9. "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005. This Court has previously noted that a change in custody is a "jolting, traumatic experience." *Ballard v. Ballard*, 434 So. 2d 1357, 1360 (Miss. 1983). As such, "children do not need to be bounced back and forth between their parents like a volleyball[.]" *Tucker v. Tucker*, 453 So. 2d 1294, 1298 (Miss. 1984). *See also Cooley v. Cooley*, 574 So. 2d 694, 699 (Miss. 1991) (overruled on other grounds) ("The best interest of the child requires that the child have some degree of stability in his or her life.") Therefore, "[a] change in custody should never be made for the purpose of rewarding one parent or punishing the other." *Tucker*, 453 So. 2d at 1297. All courts must be consistent, diligent, and focused upon the requirement that "only parental behavior that poses a clear danger to the child's mental or emotional health can justify a custody change." *Morrow v. Morrow*, 591 So. 2d 829, 833 (Miss. 1991). *See also Ballard*, 434 So. 2d at 1360 ("It is only that behavior of a parent which clearly posits or causes danger to the mental or emotional

7

well-being of a child (whether such behavior is immoral or not), which is sufficient basis to seriously consider the drastic legal action of changing custody.").

¶10.    Additionally, chancellors are charged with considering the "totality of the circumstances." *Tucker*, 453 So. 2d at 1297 (quoting *Kavanaugh v. Carraway*, 435 So. 2d 693, 700 (Miss. 1983)).  In other words:

> [a]n isolated incident, e.g., an unwarranted striking of a child does not in and of itself justify a change of custody.  *Before custody should be changed, the chancellor should find that the overall circumstances in which a child lives have materially changed and are likely to remain materially changed for the foreseeable future* and, of course, that such change adversely impacts upon the child.

*Tucker*, 453 So. 2d at 1297 (emphasis added).  "The test for a modification of child custody is: (1) whether there has been a *material change in circumstances*[8] which *adversely affects*[9] the welfare of the child and (2) whether the *best interest of the child requires a*

---

[8]In *Riley v. Riley*, 884 So. 2d 791 (Miss. Ct. App. 2004), the Court of Appeals recognized:

> "A material change of circumstances of the party *not having custody* of the children is *not* in and of itself enough to warrant a change of custody." *Bowden v. Fayard*, 355 So. 2d 662, 664 (Miss. 1978).  There *must be* a showing that a *change of circumstances in the custodial home* has occurred *which materially affects the children's welfare adversely*.  *Id*.

*Riley*, 884 So. 2d at 793 (emphasis added).  Furthermore, the material change of circumstances must be unforeseeable at the time of the original decree.  *See Lambert v. Lambert*, 872 So. 2d 679, 684 (Miss. Ct. App. 2003) ("*[t]hese changed circumstances must be such that they could not be anticipated at the time of the initial determination of custody* and of such magnitude as to justify the drastic measure of change in custody.") (emphasis added); *Tingle v. Tingle*, 573 So. 2d 1389, 1391-92 (Miss. 1990).

[9]In *Spain v. Holland*, 483 So. 2d 318 (Miss. 1986), this Court stated "[w]e need be clear what we mean by the phrase 'adverse effect.'  These children have already been adversely affected by the inability of their mother and father to live together which led to the . . . divorce."  *Id*. at 320-21.  *See also Lambert*, 872 So. 2d at 684 ("It is foreseeable, indeed

8

*change of custody.*"  ***Floyd v. Floyd***, 949 So. 2d 26, 29 (Miss. 2007) (citing ***Weigand v.***

***Houghton***, 730 So. 2d 581, 585 (Miss. 1999)) (emphasis added).  *See also **Sanford v.***

***Arinder***, 800 So. 2d 1267, 1272 (Miss. Ct. App. 2001) (quoting ***Brawley v. Brawley***, 734 So.

2d 237 (Miss. Ct. App. 1999)) ("the *non-custodial parent must* satisfy a three part test: 'a

substantial change in circumstances of the *custodial parent* since the original custody decree,

the substantial change's adverse impact on the welfare of the child, and the necessity of the

custody modification for the best interest of the child.'") (emphasis added).  Therefore:

> the non-custodial parent's request does not simply mean a re-weighing of the
> ***Albright*** factors to see who now is better suited to have custody of the child.
> *Although a re-weighing of **Albright** factors may be triggered, in reviewing the*
> *circumstances, there must be shown . . . a material change – not just a change*
> *– in circumstances, that has had an adverse affect* [sic] *on the child and which*
> *requires, or mandates, a change in custody for the best interests of the child.*

***Sanford***, 800 So. 2d at 1272 (emphasis added).  Stated otherwise, a non-custodial parent

must first sufficiently prove a material change in circumstances which has an adverse effect

on the child that "clearly posits or causes danger to the mental or emotional well-being of a

child[,]" ***Ballard***, 434 So. 2d at 1360, as a condition precedent to re-weighing the ***Albright***

factors.  The ***Albright*** factors may ebb and flow yearly, quarterly, monthly or even less, but

in the absence of a substantial adverse effect upon the child, physical custody changes are

not only unwarranted, they are unwise.  Our body of law could not be clearer.

¶11.    This Court has repeatedly held that the mere moving of the custodial parent does not

constitute a material change in circumstances for child custody modification purposes.  *See*

---

expected, that as a consequence of divorce a child will experience changes in his or her
circumstances and experience anxiety as a result of the disruption of the family unit.
Divorce has consequences which are often adverse, particularly for younger children.").

9

*Cooley*, 574 So. 2d at 699; *Spain*, 483 So. 2d at 320-21; *Pearson v. Pearson*, 458 So. 2d 711, 713-14 (Miss. 1984). *See also Lambert*, 872 So. 2d at 685. This Court has never found a non-custodial parent's relocation creates a material change in circumstances sufficient for modification of child custody.[10] Logic dictates that if the move of the custodial parent is not considered a material change in circumstances, then the move of the non-custodial parent is likewise not a material change in circumstances. To hold otherwise would permit a non-custodial parent to unilaterally create a material change in circumstances and then seek modification of custody.

¶12. This Court concludes that the chancellor applied "an erroneous legal standard," *R.K.*, 946 So. 2d at 772, in modifying custody. Therefore, we are required to reverse. The chancellor erred in finding material changes in circumstances and then disuniting isolated incidents to find an adverse affect on S.G. According to this Court in *Floyd*, there must be "a material change in circumstances *which* adversely affects the welfare of the child[.]" 949 So. 2d at 29 (emphasis added). In other words, the two cannot be separated. Furthermore, the material change in circumstances must be in the custodial home. *See Riley*, 884 So. 2d

---

[10]As Judge Griffis astutely observed in his dissent:

> the chancellor relied on the move or relocation of the *non-custodial parent* to base his finding that there was a substantial change in circumstances. I am aware of no precedent or authority that supports this holding. Indeed, Professor Deborah H. Bell discusses the "difficult issues in modification actions" presented by the relocation of parents. In each of the cases cited by Professor Bell, it is the relocation of the custodial parent that triggers the modification consideration. Deborah H. Bell, *Mississippi Family Law* § 5.11[5][b] (1st ed. 2005).

*Giannaris*, 2006 Miss. App. LEXIS at 668, *25 (Griffis, J., dissenting).

at 793. The material change in circumstances relied upon by the chancellor was the move of the non-custodial parent. Relocation of either parent is "insufficient grounds for modification of child custody." *Lambert*, 872 So. 2d at 685. Collectively, the chancellor erred in finding that Stephen's substantial visitation combined with his transfer to San Diego "constituted a substantial change in circumstances." Additionally, the material change in circumstances must be unforeseeable at the time of the original decree. *See Lambert*, 872 So. 2d at 684; *Tingle*, 573 So. 2d at 1391-92. Stephen's employment with the United States Navy comes with the eminently foreseeable certainty of transfers throughout his career. The record reflects that during Stephen's years in the Navy, he had already been assigned to duty stations in Italy, Mississippi, and California. At the hearing, Stephen conceded that he will likely be transferred again in three years.

¶13. The chancellor applied clearly erroneous legal standards in modifying custody. Furthermore, Stephen "failed to show that the mental and emotional well-being of the child was in any danger as a result of living with" Elizabeth. *Lambert*, 872 So. 2d at 685. The Court of Appeals erred in attempting to divine the chancellor's intent, by disregarding his stated reasons, and then relying upon implied facts.

**II. Whether the trial court employed a proper analysis under Miss. R. Evid. 702 as to Stephen's expert witness, clinical social worker Pat Gunkel.**

¶14. "[T]he admission of expert testimony is within the sound discretion of the trial judge. *Puckett v. State*, 737 So. 2d 322, 342 (Miss. 1999). Therefore, the decision of a trial judge will stand 'unless we conclude that the discretion was arbitrary and clearly erroneous,

11

amounting to an *abuse of discretion*.' *Id*." ***Mississippi Transp. Comm'n v. McLemore***, 863

So. 2d 31, 34 (Miss. 2003) (emphasis added). Miss. R. Evid. 702 provides:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a *witness qualified as an expert* by knowledge, skill, experience, training, or education, *may testify thereto in the form of an opinion or otherwise, if* (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702 (emphasis added). This Rule "recognizes the gate keeping responsibility

of the trial court to determine whether the expert testimony is relevant and reliable."

Comment to Miss. R. Evid. 702. *See also* ***McLemore***, 863 So. 2d at 38 ("First, the court

must determine that the expert testimony is *relevant* – that is, the requirement that the

testimony must ''assist the trier of fact' means the evidence must be relevant.' ***Mathis v.***

***Exxon Corp.***, 302 F.3d 448, 460 (5th Cir. 2002) (citing Fed. R. Evid. 702). Next, the trial

court must determine whether the proffered testimony is *reliable*. ***Pipitone*** [***v. Biomatrix,***

***Inc.***, 288 F.3d 239,] 244 [(5th Cir. 2002)]. Depending on the circumstances of the particular

case, many factors may be relevant in determining reliability, and the ***Daubert*** analysis is a

flexible one. ***Id***. ***Daubert*** provides 'an illustrative, but not an exhaustive, list of factors'[11]

_____

[11]According to ***McLemore***:

> [t]hese factors include whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the techniques of operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.

863 So. 2d at 37 (citing ***Daubert***, 509 U.S. at 592-94).

that trial courts may use in assessing the reliability of expert testimony. *Id*.") (emphasis added).

¶15.    Stephen tendered clinical social worker Pat Gunkel as an expert witness. Gunkel was S.G's therapist while employed at the Navy Family Service Center.[12]  In voir dire, Gunkel testified that her formal training in interviewing children consisted of a five-week training course and one year of working with abused children at the mental health department in Pascagoula.  She further testified that she had done "five or six" interviews of children for the purpose of reaching a recommendation about which parent should retain custody.  As to how she reached her specific recommendations in the case sub judice, Gunkel stated that she considered:

> A.  What [S.G.] told me and how she behaved in therapy.
>
> Q.  Is there any recognized textbooks or science with regard to how you would reach your conclusion or recommendation?
>
> A.  There is no exact science in psychology.  There's a lot of experimental science, but as far as reaching conclusions, a lot of it you go to training, *instinct*, and – mostly training.

(Emphasis added).  Counsel for Elizabeth objected to Gunkel's testimony arguing that "[t]here's really no scientific basis for it . . . .  The basis is simply what she has been told by

---

[12]According to Gunkel, at her initial meeting with Stephen and Anita, she "gave them a release of information for them to bring to [Elizabeth] to sign, so that she also knew that the child was in therapy, which is a thing I do with all children when there's a divorce." Despite never receiving a signed release from Elizabeth, Gunkel saw S.G. weekly from mid-July 2003 until March 2004.  Gunkel testified that she was unaware of whether Elizabeth was ever informed.  Elizabeth testified that she did not find out that S.G. was meeting with Gunkel until "almost six months after she started going."  Gunkel never interviewed or met with Elizabeth.

the . . . minor child in this case." Nonetheless, the trial court overruled the objection and allowed the testimony. Gunkel, who was being paid by Stephen, testified without any records, never administered tests to S.G., and based her opinions, in part, on S.G. seeming to be upset over the divorce of her parents.

¶16. This Court has stated that "whether testimony is based on professional studies or personal experience, the 'gatekeeper' must be certain that the expert exercises the same level of 'intellectual rigor that characterizes the practice of an expert in the relevant field.'" *McLemore*, 863 So. 2d at 37-38 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)). In this case, there is no evidence that Gunkel's opinion was either "based upon sufficient facts or data" or "the product of reliable principles and methods." Miss. R. Evid. 702. To the contrary, Gunkel's testimony was that her opinions were derived from unrecorded sessions with S.G. without independent verification of the truthfulness *vel non* of the allegations, and based upon her five-week training and instincts. This Court understands why the chancellor found that Gunkel's "information and her opinions based upon what the child said, to me, are of an insignificant weight." Nonetheless, the trial court erred in granting any weight to Gunkel's testimony, as it lacked sufficient reliability under Miss. R. Evid. 702.[13] As Gunkel was the only witness to testify

---

[13]This Court notes that Miss. R. Evid. 702 requires that (1) the witness be "qualified as an expert by knowledge, skill, experience, training, or education[;]" (2) the witness's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue[;]" and (3) the testimony is "based upon sufficient facts or data," "is the product of reliable principles and methods," and those principles and methods have been reliably applied to the facts of the case. *See* Miss. R. Evid. 702.

14

that S.G. had been adversely affected, the erroneous admission of her testimony prejudiced Elizabeth and amounted to an abuse of discretion.

## CONCLUSION

¶17. This case is reversed and judgment granted in favor of Elizabeth, awarding her primary physical custody of S.G. The case is remanded to the Harrison County Chancery Court for a determination of visitation and support issues.

¶18. **REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART**.

**SMITH, C.J., WALLER, P.J., EASLEY, CARLSON, DICKINSON AND LAMAR JJ., CONCUR. DIAZ, P.J., AND GRAVES, J., CONCUR IN RESULT ONLY.**