# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-00018-SCT

*LANIKIA SMITH, BY HER NEXT FRIEND,*
*BETTIE SMITH; CAMILLE CARTER, BY HER*
*NEXT FRIEND, LAREATHA CARTER; AMORY*
*SCHOOL DISTRICT AND AMORY SCHOOL*
*DISTRICT BOARD OF TRUSTEES*

*v.*

*CHARLES CLEMENT d/b/a M & W BUTANE GAS*
*COMPANY, INC.*

## <u>ON MOTION FOR REHEARING</u>

| | |
|---|---|
| DATE OF JUDGMENT: | 10/26/2005 |
| TRIAL JUDGE: | HON. PAUL S. FUNDERBURK |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | DAVID B. McLAURIN |
| | MICHAEL ANTHONY WILLIAMS |
| | JASON LEE SHELTON |
| ATTORNEY FOR APPELLEE: | MICHAEL F. MYERS |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 04/03/2008 |
| MOTION FOR REHEARING FILED: | 11/01/2007 |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     The appellee's motion for rehearing is granted. The previous opinions are withdrawn, and these opinions are substituted therefor.

¶2.     In this products liability case, the trial court granted the defendant's motion to strike an affidavit submitted by the plaintiff's expert in opposition to the defendant's motion for

summary judgment. The question presented is whether the trial court properly excluded the expert's affidavit. We affirm.

## FACTUAL BACKGROUND AND PROCEEDINGS

¶3. In 1981, the Amory School District ("Amory") engaged M & W Gas Company ("M & W") to convert several of its school buses from gasoline to propane fuel. After the conversion was completed, the buses were inspected and placed in service. Other than supplying propane, M & W had no more involvement with the buses.

¶4. During the fourteen years following the conversion, the buses were inspected annually. Outside contractors, including several automobile dealerships, provided regular maintenance and necessary repairs. However, pursuant to its record-retention policy, Amory destroyed several years of the maintenance and repair records.

¶5. In May 1995, one of the buses caught fire. Two children on the bus, Lanikia Smith and Camille Carter, were burned while attempting to escape. The following year, the girls filed suit against Amory, alleging several theories of liability. Four years later, Amory filed a third-party complaint against M & W. The plaintiffs settled with Amory, leaving before us only the claim against M & W which is, essentially, that M & W was negligent in its installation of the propane fuel system for the bus.

¶6. On March 24, 2005, M & W moved for summary judgment, claiming Amory could not present a genuine issue of material fact as to its claim that "the propane fuel system was in the same condition in May, 1995 [the time of the fire] as it was when it left M & W Gas in August, 1981." Amory responded to the summary judgement motion on April 18, 2005, including with its response an affidavit from its expert, Dr. Richard E. Forbes. In his

2

affidavit, which was dated April 15, 2005, Dr. Forbes averred that the fire was caused by a leak in the copper tubing, which was improperly flared. He further opined that "the copper tubing originally flared by M & W Gas Company in 1981 [was] the same copper tubing which was on [the bus] in 1995 at the time of the fire."

¶7. On May 5, 2005, M & W responded with a motion to strike Dr. Forbes's affidavit. In support of its motion to strike, M & W provided an affidavit from its own expert, Derek T. Nolen, a mechanical engineer who attested to having "extensive training in explosion and fire analysis of liquefied propane gas, mechanical systems and component failure analysis." After examining the bus maintenance records from July 23, 1992, to March 9, 1995, and parts invoices from August 26, 1991, to December 11, 1992, Nolen opined in his affidavit that "there are no reliable, or valid, scientific principles or methods that could be utilized by any engineer, or any other specialist, that would enable that person to give an opinion based in science regarding from what manufacturer or seller the copper tubing or brass fittings . . . came, the age of the tubing and fittings, the date that the tubing and fittings were installed, or the date that the tubing was flared and by whom it was flared."

¶8. Nolen further opined that the only possible reliable means of determining the identity, age and date of installation of the copper tubing would be to construct an exact chain of custody for the fourteen years between the 1981 installation of the original propane system and the May 23, 1995, incident at hand, but that sufficient data did not exist to identify accurately all the necessary persons to form such an opinion based in science.

3

¶9.    A hearing on M & W's motion for summary judgment and motion to strike Dr. Forbes's affidavit was scheduled for May 9, 2005, but, at the request of Amory, was continued.  The hearing took place on October 19, 2005.

¶10.    On October 27, 2005, the trial court granted M & W's motion to strike Dr. Forbes's affidavit, holding in a one-page order "that the opinions expressed by Dr. Forbes in his affidavit are nothing more than unsupported conclusions which are devoid of a factual basis and not the product of reliable principles and methods."  On the same day, the trial court granted M & W's motion for summary judgment, finding that there was "no genuine issue of material fact as to causation," as the plaintiffs could not offer credible expert testimony as to causation.  The trial court later denied motions to reconsider the orders filed by the plaintiffs and denied a request to submit a new affidavit by Dr. Forbes.  Amory timely perfected its appeal.

## ANALYSIS

¶11.    The dispositive issue presented is whether the trial court committed reversible error by striking Dr. Forbes's affidavit and granting summary judgment to M & W.  The standard of review for the suppression of evidence is abuse of discretion.  *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003).  When reviewing a trial court's grant of summary judgment, this Court conducts a de novo review.  *Croft v. Grand Casino Tunica, Inc.*, 910 So. 2d 66, 72 (Miss. 2005).

## I.

¶12.    In order to prevail, Amory was required to present some evidence of its theory that M & W negligently installed copper tubing when it converted Amory's buses from gasoline

4

to propane in 1981, and that the negligently-installed copper tubing caused the fire which injured the plaintiffs. ***Laurel Yamaha, Inc. v. Freeman***, 956 So. 2d 897, 904 (Miss. 2007) (citing ***Meena v. Wilburn***, 603 So. 2d 866, 869 (Miss. 1992) (explaining the elements of a negligence cause of action)). M & W moved for summary judgment, asserting that Amory had no way to meet this burden because of the absence of maintenance and repair records for much of the fourteen-year period between the conversion and the fire.[1] Amory attempted to overcome this problem and to meet its burden by presenting Dr. Forbes's affidavit. Essentially, Dr. Forbes opined that the fire was caused by improperly-flared copper tubing, and that the copper tubing in place at the time of the fire was the same copper tubing installed by M & W. It is this opinion that we must now analyze.

¶13. The primary rule which governs the admissibility of expert opinion in Mississippi is Rule 702 of the Mississippi Rules of Evidence which, as amended in 2003, provides:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702. The 2003 amendment is best explained in the Rule's official comment:

> By the 2003 amendment of Rule 702, the Supreme Court clearly recognizes the gate keeping responsibility of the trial court to determine whether the expert testimony is relevant and reliable. This follows the 2000 adoption of a like amendment to *Fed. R. Evid.* 702, adopted in response to ***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579 (1993). It is important to note that Rule 702 does not relax the traditional standards for determining that

---

[1]As stated earlier, the buses were regularly maintained and repaired by several independent contractors, but the records were destroyed pursuant to Amory's record-retention policy.

5

the witness is indeed qualified to speak an opinion on a matter within a purported field of knowledge, and that the factors mentioned in **Daubert** do not constitute an exclusive list of those to be considered in making the determination; . . . .

Miss. R. Evid. 702, cmt.

¶14. Thus, with the 2003 amendment, our trial judges became "gate keepers" with the responsibility of determining, in the first instance, whether an expert's proffered opinion is both relevant and reliable.[2] **Poole v. Avara**, 908 So. 2d 716, 723 (Miss. 2005). According to Rule 702, a trial judge – in performing his or her gate-keeping responsibilities – should examine whether "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Miss. R. Evid. 702.

¶15. In **Mississippi Transportation Commission v. McLemore**, 863 So. 2d 31 (Miss 2003), this Court adopted "the federal standards and applie[d] our amended Rule 702 for assessing the reliability and admissibility of expert testimony." **Id.** at 39. The **McLemore** Court held that the proffered expert opinion was inadmissible because it was mere speculation, unsupported by reliable scientific methods and procedures. **Id.** at 40-42.

¶16. In **Edmonds v. State**, this Court considered the State's expert's opinion, based on observation in an autopsy, of causation of the victim's fatal wound. **Edmonds v. State** 955 So. 2d 787, 791 (Miss. 2007). The expert testified that the fatal wound was caused by a gunshot, and that the trigger of the gun was pulled by two persons, as opposed to a single

---

[2]Although there may be instances where a trial court *sua sponte* calls an expert's testimony into question, these issues usually will arise only when, and to the extent, a party objects to the opinions proffered or the expert's qualifications.

shooter. *Id.* This Court agreed with the defendant's argument that "such testimony was scientifically unfounded: 'You cannot look at a bullet wound and tell whether it was made by a bullet fired by one person pulling the trigger or by two persons pulling the trigger simultaneously.'" *Id.* at 792. The Court held that the testimony should have been excluded on the ground that the state did not show that its expert's testimony was based on reliable methods or procedures, and therefore, the testimony did not meet our standards for admissibility. *Id.*

¶17.    In the case before us today, Amory's expert, Dr. Forbes, opined that the copper tubing which caused the fire was the same copper tubing installed fourteen years earlier by M & H. Had there been no challenge to this opinion, it arguably might have been sufficient to defeat summary judgment. However, M & H challenged Dr. Forbes's opinion by producing expert testimony which stated:

> there are  no reliable, or valid, scientific principles or methods that could be utilized by any engineer, or any other specialist, that would enable that person to give an opinion based in science regarding from what manufacturer or seller the copper tubing or brass fittings . . . came, the age of the tubing and fittings, the date that the tubing and fittings were installed, or the date that the tubing was flared and by whom it was flared.

¶18.    From May 5, 2005 (the date Nolan's affidavit attacked the scientific basis of Dr. Forbes's opinion), until October 27, 2005 (the date summary judgment was granted), neither Amory nor Dr. Forbes submitted any evidence or scientific findings contradicting Nolan's opinion.  Thus, as to whether Dr. Forbes's opinion was properly grounded in science, the only evidence before the trial court was Nolan's affidavit, which clearly stated that it was not.

7

¶19.    Amory complains that the trial court "did not conduct a **Daubert** hearing before reaching its decision." Amory misunderstands what is required under Rule 702. We have never held that a trial court is required to hold a formal "**Daubert**" hearing when an expert's opinions are challenged.[3] We only require that, when an expert's opinion is challenged, the party sponsoring the expert's challenged opinion be given a fair opportunity to respond to the challenge. The provision of a fair opportunity to respond is part of the trial court's gate-keeping responsibility, and we will reverse only where the trial court abused its discretion by clearly failing to provide a fair opportunity to respond. We are unable to say in this case that the trial court abused its discretion. For five months, Amory was on notice of the specific challenge to its expert's opinion. It had ample opportunity to submit scientific evidence and other indications of the reliability of Dr. Forbes's opinion. Amory failed, however, to submit any evidence whatsoever that Dr. Forbes's opinion was based on sound scientific principles. Indeed, neither Amory nor Dr. Forbes provided so much as a denial as to the accuracy of Nolen's affidavit. Thus, we cannot say that the trial court abused its discretion in finding, from the evidence in the record, that Dr. Forbes's affidavit should be stricken.

¶20.    Without Dr. Forbes's opinion, Amory is unable to prove that the copper tubing which allegedly caused the fire was the same tubing installed by M & W. Consequently, Amory cannot prove M & W was negligent in its installation. Therefore, the trial court properly granted summary judgment in favor of M & W.

---

[3]As this Court noted in **Edmonds v. State**, "a court is not required to hold an actual hearing to comply with **Daubert.**" **Edmonds v. State** 955 So. 2d 787, 791-92 (quoting **Greenwell v. Boatwright**, 184 F.3d 492, 498 (6th Cir. 1999)).

CONCLUSION

¶21. For the reasons stated, we hold that the trial court did not abuse its discretion in striking the affidavit of Dr. Forbes and, consequently, granting summary judgment. The motion for rehearing is therefore granted and the judgment of the Circuit Court of Monroe County is affirmed.

**AFFIRMED**.

**SMITH, C.J., CARLSON, RANDOLPH AND LAMAR, JJ., CONCUR. WALLER, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY DIAZ, P.J., EASLEY AND GRAVES, JJ. DIAZ, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY AND GRAVES, JJ.**

**WALLER, PRESIDING JUSTICE, DISSENTING:**

¶22. Two experts reached different conclusions drawn from a common set of facts. The affidavits expressing these conclusions demonstrate that a genuine issue of material fact existed when the trial court granted summary judgment. The trial court erroneously struck the affidavit of Dr. Forbes based upon unsubstantiated opinions from the other expert. The strength of these two opinions goes to the weight of the evidence and should be heard at trial. Since the majority holds otherwise, I respectfully dissent.

¶23. The trial court erroneously struck Dr. Forbes's affidavit on the bases that it was (1) "nothing more than unsupported conclusions which are devoid of a factual basis" and (2) "not the product of reliable principles and methods." Dr. Forbes's first affidavit states that he personally examined the school bus, knew the liquid petroleum modification to the school bus was performed by M & W Gas, and observed the copper tubing and its flared end. It also contains a general statement that Forbes was familiar with the lawsuit. Dr. Forbes's second

9

affidavit indicates he reviewed all the maintenance records for the school bus. From these recitations in Dr. Forbes's affidavits, it is clear Dr. Forbes's opinions were not "devoid of a factual basis." This reason is insufficient to strike his affidavits.

¶24. The trial court's finding that Dr. Forbes's conclusions were not based on reliable principles and methods is itself based upon unsubstantiated opinions.[4] In opposition to Dr. Forbes's affidavit, M & W Gas offered the affidavit of Derek Nolen, who stated the following relevant opinions which have been summarized:

> (1) No test could be performed to determine the age of the copper tubing and brass fittings or the date that the tubing was flared or by whom it was flared;
> (2) there are no reliable, or valid, scientific principles or methods that could be utilized by any engineer that would enable the engineer to give an opinion based in science regarding the age of the tubing and fittings, the date the tubing and fittings were installed, or the date the tubing was flared and by whom it was flared;
> (3) the only reliable principle or method to determine the age of the copper tubing and fittings that were on the school bus would be to construct an exact chain of custody for the years between the installation and the accident;
> (4) if any person had custody of the bus between installation and the accident or provided parts for installation on the bus during that time, sufficient data would not exist to determine whether the tubing and fittings were the same as those installed;
> (5) even if an accurate and exact chain of custody could be provided to establish the tubing and fittings on the bus at the time of the accident were the same as installed, this fact would not establish that the tubing and fittings were in the same condition as installed.

Completely absent from Nolen's affidavit is any study or evidence supporting any of these conclusions. The trial court simply took his word over that of Dr. Forbes, who based his testimony on the same facts and the generally accepted industry standard that the type of copper tubing used on the bus is expected to have a minimum useful service life of twenty

---

[4]Though the plaintiffs and the school district offered, on motion to reconsider, to support Dr. Forbes's opinions with further testimony, the trial court declined.

10

years. Since Nolan did not contradict Forbes's statements concerning the generally accepted industry standard, we must assume, on summary judgment, that it is true and that it supports his conclusion that the tubing and fittings were the same as installed by M&W Gas. Since Nolan did not offer any scientific support for his own conclusions, and since Nolan's affidavit does not contradict the basis upon which Forbes's second affidavit reaches its conclusion, I find there is a clear issue of material fact to be tried.

¶25. I also see no reason to give Nolan's affidavit any greater weight in this context than that of Forbes. *Cf.* ***Daniels v. GNB, Inc.***, 629 So. 2d 595, 602 (Miss. 1993) (citing ***Ford Motor Co. v. Cockrell***, 211 So. 2d 833, 837 (Miss. 1968)) ("[T]he reasonableness of an expert's opinion and the weight to be accorded thereto are questions of fact for the jury."). Reading paragraphs 11, 12, and 13 of Nolan's affidavit, one can only conclude that, even under ideal circumstances, it would be impossible for Nolan to determine the responsible party for the failure of the fittings and tubing. His conclusions are based upon the assumption that the person or company that installed the tubing and fittings cannot be identified by examining the parts themselves. This conclusion overlooks the fact that the company which installed the tubing and fittings on this bus is clearly identified in this record as M & W Gas. Most importantly, there is nothing in this record to indicate the fittings and tubing were altered or replaced.[5]

---

[5]The record does contain invoices for work performed on the bus, including one which describes the work as "overhaul vaporizer." Neither the motion for summary judgment nor the exhibits attached to it explain the work performed to any degree sufficient to rebut the plaintiffs' proof that a leak in the tubing flared by M&W Gas caused the bus fire. Nor did the defendants offer any proof that the overhaul "would not require that the copper tubing connecting the vaporizer be replaced" or that "there would be no requirement that the flare nut be removed from the copper tubing."

¶26.   M&W Gas asked the trial court to assume the tubing and fittings on the bus had been replaced during subsequent maintenance of the bus, over which it had no control. Our standard of review for summary judgment does not permit our courts to make such assumptions in favor of the moving party. *See **Erby v. North Miss. Med. Ctr.***, 654 So. 2d 495, 499-500 (Miss. 1995); ***Short v. Columbus Rubber & Gasket Co.***, 535 So. 2d 61, 63-64 (Miss. 1988). Furthermore, Forbes's affidavit stands in opposition to this conclusion, again identifying a genuine issue of material fact which must be examined at trial. *Cf.* ***Drummond v. Buckley***, 627 So. 2d 264, 268 (Miss. 1993) (citing ***Kelley v. Frederic***, 573 So. 2d 1385, 1389 (Miss. 1990)) ("There is no magical form to which a plaintiff's supporting expert opinion must conform, so long as its import is apparent."). Finally, M&W Gas bears the burden of demonstrating an intervening cause (such as the tubing and fittings being replaced or damaged during regular maintenance) extinguished any liability it might have. ***Wal-Mart Stores v. Johnson***, 807 So. 2d 382, 388 (Miss. 2001). Such questions are for the jury. *See* ***Yazoo & Miss. Valley R.R. Co.***, 103 Miss. 150, 163, 60 So. 73 (1912) (quoting ***Milwaukee & St. Paul R. R. Co. v. Kellogg***, 94 U.S. 469, 474, 24 L. Ed. 256, 259 (1876)) ("The true rule is that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it.").

¶27.   For these reasons, I cannot join the majority. Summary judgment was improperly granted by the trial court and its judgment should be reversed and this matter remanded for further proceedings.

**DIAZ, P.J., EASLEY AND GRAVES, JJ., JOIN THIS OPINION.**

**DIAZ, PRESIDING JUSTICE, DISSENTING:**

¶28. I fully concur with Presiding Justice Waller's dissent but write separately to express my concerns over the consequences of today's majority opinion.

¶29. As noted in *Edmonds*, and recognized by the majority, "the basic requirement under the law is that the parties have an 'opportunity to be heard before the [trial] court makes its decision.'" *Edmonds v. State*, 955 So. 2d 787, 792 (Miss. 2007) (quoting *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 761 n.3 (8th Cir. 2003)). I simply cannot agree with the majority that the plaintiffs were given this opportunity when the defendants attached Dr. Nolan's affidavit to their motion to strike.

¶30. In my view, the best approach, and the one broadly followed, is that "in limine hearings are generally recommended prior to *Daubert* determinations." *Group Health Plan*, 344 F.3d at 761 n.3 (citing *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999)). It is also the "most efficient procedure" a trial court can use when presented with complex evidence. *United States v. Downing*, 753 F.2d 1224, 1241 (3d Cir. 1985).

¶31. An in limine hearing regarding expert testimony is also a cautious approach best suited for the comparable complexities of the post-*Frye* Rule 702. Perhaps before *Daubert*, such a determination could be made without a hearing, but the continual evolution of science and the growing intricacies of litigation mandate that we take the trial court's role as "gatekeeper" seriously, because our trial "courts have an important role as gatekeepers in determining whether to admit expert testimony." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). Therefore the trial "courts must *carefully analyze* the studies

13

on which experts rely for their opinions before admitting their testimony." *Id.* (emphasis added). A hearing is simply the best method of guarding the admission of expert testimony.

¶32. Yet as *Edmonds* noted, in *some* cases "a court is not required to hold an actual hearing to comply with *Daubert.*" *Edmonds*, 955 So.2d at 792 (quoting *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir. 2001)). Common sense informs us that, in some cases, an expert may be drastically unsuited to testify; for example, for a lack of standing within the proffered field or a discredited background. Yet that lack of a formalized inquiry must be balanced with some other "opportunity to be heard" for the parties. Several federal circuits have addressed the issue when district courts have refused to hold a *Daubert* hearing.

¶33. In one Eighth Circuit case where there was no hearing, the parties were still afforded an "an adequate opportunity to be heard " because they "were allowed to exceed the normal page limits in their briefs on [the] motion for summary judgment, and the district court permitted [the nonmovant] to present written submissions by [its expert] and other experts in support of their argument." *Group Health Plan*, 344 F.3d at 761.

¶34. Similarly, in one Sixth Circuit case, *Nelson v. Tennessee Gas Pipeline Co.*, a district court did not conduct a *Daubert* hearing. 243 F.3d at 249, *cert. denied*, 534 U.S. 822, 122 S.Ct. 56, 151 L.Ed.2d 25 (2001). However, there was an opportunity to be heard because "[t]he admissibility of the testimony of [the experts] under *Daubert* was fully briefed by the parties," and "it is clear from the extensive record and the magistrate judge's opinion that there was an adequate basis from which to determine the reliability and validity of the experts' opinions." *Id.*

¶35.    The First Circuit examined the problems with pulling the trigger early on *Daubert*, noting that "[t]he fact that *Daubert* can be used in connection with summary judgment motions does not mean that it should be used profligately." *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997). "[G]iven the complex factual inquiry required by *Daubert*, courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record," and so the First Circuit concluded that "[b]ecause the summary judgment process does not conform well to the discipline that *Daubert* imposes, the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage." *Id.*

¶36.    A startling difference exists between the fact pattern in *Edmonds*, the cases cited above, and today's case – the parties here never had "an opportunity to be heard" regarding their expert testimony. The affidavit attached to the response to a motion for summary judgment and the lawyers' presence at a hearing for summary judgment is not "an opportunity to be heard" within the meaning of our case law, the case law of other jurisdictions, or the substantive due process import of the rulings in *Daubert* and *Kumho Tire*. Ultimately, while "[t]o exclude evidence is within purview of the court . . . determinations to exclude evidence before the challenging party has an opportunity to develop the record are unfair and improper." *Inline Connection Corp. v. AOL Time Warner Inc.*, 472 F.Supp.2d 604, 611-12 (D.Del. 2007) (internal quotation and citation omitted).

¶37.    Secondly, let us examine the realities of litigation practice. The expert for the plaintiffs submitted an affidavit that was then attached to a response to a motion for summary judgment. In litigation, such affidavits often do not develop the full testimony of the expert,

15

their exact methodologies, or a point-by-point analytical structure of their intended testimony. Rather, these are sometimes "snapshots" of the general brunt of the intended testimony, offered to support the rebuttal to the motion for summary judgment. In many instances, the identity of the expert and a general idea of his or her testimony will already have been disclosed in the discovery process.

¶38. If summary judgment is survived by the nonmovant, the normal procedure is that the expert will then be deposed, and oftentimes a separate *Daubert* challenge will be issued via motion. It is true that we should accord trial courts broad latitude as regards expert testimony. Yet we should not accord latitude of any fashion when a trial court flatly fails to perform even the most basic analysis of the testimony. As noted by the ample precedent above, the parties must have an opportunity to be heard regarding their proffer of experts and expert testimony.

¶39. Next, let us contemplate the import that this will have on our trial courts and civil practice. Litigants, take heed: No longer can you rely upon the time-honored (and precedent-based) method of affixing an affidavit to your response in order to combat a motion for summary judgment. Instead, you must tender a full accounting of your expert's reasoning. It is not known whether one must disclose the full report of the expert (if one exists), the supporting sources, or frankly, what would suffice to please the majority under today's opinion, because the majority offers no guidance of any sort.

¶40. Finally, make no mistake: This decision does not just have grave repercussions for all litigation practice in Mississippi and for the rights of plaintiffs and defendants in cases with

16

expert testimony. The result of the today's opinion is to derail the cause of action of two children who were terribly burned on a school bus.

¶41. The complaint of the schoolchildren details the horrors they suffered when headed home from their school in Amory. Their injuries are not in dispute. After the bus had caught fire, the girls, "while attempting to escape from [the] fumes and fire, were severely burned." Lanika "received excruciating pain and permanent burns to her face, involving both ears, right arm, left arm, right hand, left hand, left thigh and left leg for a total of sixteen percent (16%) of her body." She then stayed in a burn unit for ten days, "where she underwent daily skin care treatments which involved . . . the scraping of her skin, tub baths and dressing changes." Her medical bills totaled more than $17,000.

¶42. Camille "received first and second permanent degree burns to her face, hands and left shin as she attempted to escape" from the burning school bus. She, too, spent time in a hospital, suffering the dressing of her burns, but ultimately fared better than her classmate Lanika.

¶43. Because the majority has refused to allow these plaintiffs an opportunity to be heard regarding the expert testimony they wish to offer, departing from our rules, established precedent, and standard litigation practice, I must dissent.

**EASLEY AND GRAVES, JJ., JOIN THIS OPINION.**