# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-01756-SCT

*CITY OF JACKSON, MISSISSIPPI*

*v.*

*SHARON TRIGG SPANN*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/11/2007 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | PIETER TEEUWISSEN |
| ATTORNEY FOR APPELLEE: | JOE N. TATUM |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 01/22/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Sharon Trigg Spann filed a negligence lawsuit against the City of Jackson and Mary Jenkins in the Circuit Court of the First Judicial District of Hinds County.  Before trial, Spann settled with Jenkins, leaving the City as the sole defendant.  Following a non-jury trial, the circuit judge awarded Spann $285,595.52 in damages.  Both parties agreed to a setoff of $25,000, which reflected the amount of the pre-trial settlement with Jenkins.  The circuit judge subsequently entered an amended final judgment in the amount of $260,595.52. Because there is no substantial, credible evidence to support the awards for future surgery

and disability, we affirm in part and reverse and remand in part, for entry of a remitted judgment of $70,595.52.

## FACTS AND PROCEDURAL HISTORY

¶2.     From the pleadings, transcript, depositions, and Spann's proposed findings of fact and conclusions of law,[1] we glean the following.

¶3.     On October 21, 2003, Officers Reginald Liggins and Rueben Currie (hereinafter collectively "the Officers"), acting in their official capacity, initiated pursuit of a silver Nissan Altima traveling north on Valley Street. According to Officer Liggins, the Altima had run a stop sign[2] and had no license plate. When the Officers engaged their blue lights, the Altima fled north on Valley Street and turned west onto Capitol Street at speeds between seventy and eighty miles per hour. The Officers were unable to overtake the vehicle and abandoned their pursuit. Suspecting that the Altima had been stolen, they canvassed a few neighborhoods where stolen cars frequently are left. They eventually resumed their normal patrol.

¶4.     Soon thereafter, the Officers spotted the same Altima at the intersection of St. Charles Avenue and Ellis Avenue. As soon as the driver of the Altima saw the Officers, he ran the red light and sped south on Ellis Avenue. The Officers, in turn, resumed their chase. The Altima traveled past Hardy Middle School, the Jackson Public School's Career Development

---

[1]   *See infra*.

[2]   Officer Currie stated that he did not see the Altima run a stop sign at that point.

2

Center, and Provine High School at speeds in excess of sixty miles per hour, and ran several red lights along the way.

¶5.    The Officers followed the Altima into the intersection of Ellis Avenue and Lynch Street.  As they entered the intersection, the Officers slowed down and checked for oncoming traffic.[3]  There is conflicting testimony as to whether or not the Officers had on their lights and siren as they entered the intersection.[4]  Inside the intersection, the Officers' patrol car collided with a Nissan Maxima driven by Jenkins.  The force of the collision caused their patrol car to hit a Federal Express truck driven by Spann.

¶6.    After the accident, Spann was treated at Baptist Medical Center in Jackson and released that same day.  The next morning, she claimed that she experienced pain throughout her body and could hardly move.  In the following months, Spann was examined by several doctors[5] who offered varying opinions, including Dr. Charles N. Crenshaw, Dr. Dinesh Goel, Dr. James L. Williams, and Dr. George E. Wilkerson.[6]  Spann attempted to return to her job

---

[3]  Officer Currie testified that a termination order was given before the Officers reached the intersection.  Officer Liggins, on the other hand, stated that they did not receive the order until after the accident.

[4]  According to Spann, the Officers did not have their sirens on as they entered the intersection.  Jenkins also stated that she did not see any blue lights or hear a siren as she approached the intersection.  Officer Liggins, however, said that they had their lights and siren on going into the intersection.

[5]  The names of several different physicians who treated Spann appear throughout the record.  However, only the testimony and records of Drs. Crenshaw, Goel, Wilkerson, and Williams were submitted at trial.

[6]  The findings of each of these respective physicians are discussed *infra*.

3

at Federal Express, but she was dismissed and told not to return until her medical restrictions had been removed.

¶7. On June 24, 2004, Spann filed suit against Jenkins and the City in the Circuit Court of the First Judicial District of Hinds County. Jenkins was dismissed with prejudice after settling with Spann for $25,000. After a non-jury trial on December 12, 2005, the circuit judge ruled for Spann in the amount of $285,595.52. The City filed a motion to amend or vacate the judgment, or in the alternative, for a new trial, to which Spann filed a response. The circuit judge denied the City's motion to vacate the judgment and motion for new trial, but entered an amended judgment of $260,595.52 to set off the earlier settlement with Jenkins.

¶8. The City now appeals to this Court raising the following two issues: (1) whether the circuit court erred in finding the City one hundred percent liable; and (2) whether the award was against the substantial, credible evidence.

**DISCUSSION**

**I. Whether the circuit court erred in finding the City one hundred percent liable.**

¶9. This case was filed pursuant to the Mississippi Tort Claims Act, and therefore, was subject to hearing and determination by a judge sitting without a jury. Miss. Code Ann. § 11-46-13 (Rev. 2002). The findings of a circuit court judge sitting without a jury "will not be reversed on appeal where they are supported by substantial, credible, and reasonable evidence." *Donaldson v. Covington County*, 846 So. 2d 219, 222 (Miss. 2003) (citing *Maldonado v. Kelly*, 768 So. 2d 906, 908 (Miss. 2000)). However, where a trial judge

4

adopts, verbatim, findings of fact and conclusions of law prepared by a party to the litigation, this Court analyzes those findings with greater care, and the evidence is subjected to heightened scrutiny. *Brooks v. Brooks*, 652 So. 2d 1113, 1118 (Miss. 1995) (citing *Omni Bank v. United Southern Bank*, 607 So. 2d 76, 83 (Miss. 1992); *Matter of Estate of Ford*, 552 So. 2d 1065, 1068 (Miss. 1989)). Because the trial judge adopted Spann's findings of fact and conclusions of law substantially verbatim, less minimal superficial editing, the deference normally afforded the trial judge is lessened. *See Brooks*, 652 So. 2d at 1118 (citing *Omni Bank*, 607 So. 2d at 83).

¶10. The City does not appeal the circuit court's finding that the Officers acted with reckless disregard in pursuing the Altima.[7] Rather, the City argues that even if the Officers acted with reckless disregard, the circuit court failed properly to establish that their actions

---

[7] Mississippi Code Annotated Section 11-46-9(1)(c) (Rev. 2002) states that:

(1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim: . . .

(c) Arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection *unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury*;

Miss. Code Ann. § 11-46-9 (1)(c) (Rev. 2002) (emphasis added).

This Court has set forth ten factors to consider in determining whether a police pursuit constituted reckless disregard. *City of Ellisville v. Richardson*, 913 So. 2d 973, 977-78 (Miss. 2005) (citing *Johnson v. City of Cleveland*, 846 So. 2d 1031 (Miss. 2003)). The City's brief, however, specifically states that "an analysis of the reckless disregard factors in a pursuit context is unnecessary in the case at bar."

5

were a proximate cause of Spann's injuries, and, even if the Officers were a proximate cause, the circuit court erred by not apportioning fault to Jenkins, who also was a proximate cause.

¶11.   To recover damages in a negligence suit, a plaintiff must establish that the damage was proximately caused by the negligent act of the defendant(s). *Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1277 (Miss. 2007); Miss. Code Ann. § 85-5-7 (1), (5) (Rev. 1999) (fault is allocated only to the party(s) which proximately caused the injury to the plaintiff). Proximate cause requires the fact finder to find that the negligence was both the cause in fact and the legal cause of the damage. *Glover*, 968 So. 2d at 1277 (citing Dobbs, The Law of Torts, § 180 at 443 (2000)). "Cause in fact" means that, but for the defendant's negligence, the injury would not have occurred. *Glover*, 968 So. 2d at 1277. If the plaintiff's injuries are brought about by more than one tortfeasor, cause in fact is based upon whether the negligence of a particular defendant was a substantial factor in causing the harm. *Id.* at 1277 n.11 (citing Dobbs, The Law of Torts, § 171 at 415). Once cause in fact is established, the defendant's negligence will be deemed the legal cause so long as the damage "is the type, or within the classification, of damage the negligent actor should reasonably expect (or foresee) to result from the negligent act." *Glover*, 968 So. 2d at 1277 (citing Dobbs, The Law of Torts, § 180 at 443).

¶12.   We find substantial evidence to support the circuit court's finding that the Officers' conduct was a proximate cause of the accident. But for the high-speed pursuit and the manner in which the Officers proceeded into the intersection, the accident would not have occurred. Spann testified that the Officers did not have their sirens on at the time of the

6

wreck. Jenkins, likewise, did not see any blue lights or hear a siren as she approached the intersection. While the Officers testified to the contrary, the circuit judge was entitled to weigh the credibility of this conflicting testimony. Additionally, Spann's expert Dennis Waller[8] opined that the Officers went through the intersection much faster than the fifteen-to-twenty miles per hour that they asserted.[9] Even if the Officers did in fact slow down and check for oncoming traffic, Waller explained that they were obligated to stop and ensure that all traffic had stopped.[10] It also was highly foreseeable that the Officers' conduct could lead to an accident.

¶13.    We further find that the circuit court did not fail to address the comparative fault of Jenkins, but simply assigned one hundred percent fault to the City. The circuit court did not set forth specific percentages of fault either to the City or to Jenkins, but clearly held that the Officers were "*the* proximate cause[]" of the accident. By finding only one proximate cause, the circuit court implicitly assigned no fault to Jenkins.[11]

---

[8]  There is no known kinship between the writing justice and Dennis Waller.

[9]  General Order 600-20 requires that officers not enter a signaled intersection at speeds greater than fifteen miles per hour.

[10]  General Order 600-20 also requires that officers ensure that all traffic has yielded before proceeding through a signaled intersection.

[11]  The City cites *City of Ellisville v. Richardson*, 913 So. 2d 973 (Miss. 2005), and *Mississippi Department of Public Safety v. Durn*, 861 So. 2d. 990 (Miss. 2003), to support its argument that the circuit court failed to address the comparative fault of Jenkins. Each of these cases, however, is distinguishable from the case before us. In *City of Ellisville*, the trial court's findings on the allocation of fault were ambiguous. *City of Ellisville*, 913 So. 2d at 980. In *Durn*, the trial court failed to determine if comparative fault should have been assigned to the plaintiff. *Durn*, 861 So. 2d at 999.

¶14. We also find substantial evidence to support the circuit court's finding that Officers were the sole proximate cause of the collision. As previously noted, Waller testified that the Officers were the sole proximate cause of the wreck. As a general rule, a "motorist's right to assume that the driver of a vehicle proceeding toward an intersection will obey the law of the road, which requires him to stop before entering the intersection, exists only until he knows or in the exercise of ordinary care should know otherwise." **Busick v. St. John**, 856 So. 2d 304, 317 (Miss. 2003) (quoting **Jobron v. Whatley**, 250 Miss. 792, 168 So. 2d 279, 284 (1964)). Certain facts suggest that Jenkins should have realized the need to stop before entering the intersection—all other traffic had halted and she admitted that her eyes were tired. Nevertheless, Jenkins stated that she was observant and focusing straight ahead at the time. More significantly, Jenkins testified that she had a green light and did not see any blue lights or hear any siren as she proceeded into the intersection. This corresponds with Spann's testimony that the Officers did not have their lights and sirens engaged at the time of the accident. While admittedly a close question of fact, we find reasonable evidence to support the circuit court's finding.

¶15. For the aforementioned reasons, we find the City's first assignment of error to be without merit.

**II.     Whether the award was against the substantial, credible evidence.**

¶16. As discussed under Issue I, we analyze the evidence in the subject case with heightened scrutiny. *See* **Brooks**, 652 So. 2d at 1118 (citing **Matter of Estate of Ford**, 552 So. 2d at 1068). When reviewing an award for damages, this Court will not overturn an

8

award unless the damages are "so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable, and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption." *United States Fid. & Guar. Co. v. Estate of Francis*, 825 So. 2d 38, 47 (Miss. 2002) (quoting *Biloxi Elec. Co. v. Thorn*, 264 So. 2d 404, 405 (Miss. 1972)).

¶17.   The City argues that the trial court simply ignored the testimony of Drs. Williams and Wilkerson.   It further submits that the testimony of Drs. Crenshaw and Goel does not reasonably support the circuit court's award of damages.  We note that all of the physicians testified by deposition so the trial court was not able to observe their demeanor.

¶18.   Dr. Crenshaw, who is a family physician at the Reservoir Family Medical Clinic in Flowood, Mississippi, saw Spann on twenty-four occasions from October 22, 2003, through May 25, 2005.  He initially determined that Spann had "right posterior neck muscle and and left anterior neck muscle strain and spasm, contusion, possible strain to the left knee,[12] lumbosacral strain and spasm and a tension headache."   He prescribed some anti-inflammatories and muscle relaxers, and recommended physical therapy.

¶19.   In her following visits with Dr. Crenshaw, Spann exhibited various other symptoms. In December 2003, she showed for the first time some signs of nerve damage consistent with a L4-5 nerve root compression.  In January 2004, she complained of a "band like [sic] headache" and arthritic pain in her hands, arms, feet, and legs.  In February 2004, she cited

---

[12]  He noted that she had "a little bit of a limp because of the left knee injury."

pain in her left arm. Given these odd changes, Dr. Crenshaw referred her to a neurologist, Dr. Wilkerson. In April 2004, Dr. Crenshaw reviewed a magnetic resonance imaging (MRI) report. According to Dr. Crenshaw, the report showed no significant compromise throughout the lumbar spine and a normal distal cord. The report did, however, indicate "some minor arthritic type changes, concentric disk [sic] bulge a[t] L4-5, [and] some facet joint hypertrophy." Dr. Crenshaw believed that the MRI findings lent credibility to Spann's complaints of lower-back pain. He described her condition as "chronic whiplash injury."

¶20. While Dr. Crenshaw thought that Spann had embellished some things, his overall opinion was that she did suffer an actual injury as a result of the accident. There were some problems that he could not relate to the wreck, such as arthritic-type pain in her hands, arm, and feet. Nevertheless, he stated that the pain in her right posterior neck and the general area of the L4-5 disc in her lower back was objectively "reproducible every time." He also stated that these particular symptoms would be consistent with the type of collision that she had experienced.

¶21. Dr. Crenshaw opined that Spann could have performed some light duty—but no heavy lifting—between October 2003 and May 2005.[13] He stated that she probably could have driven a delivery truck and that she needed to move around some, but said that she should not pick up and haul packages until she fully recovered. Because her last visit to him was in May 2005, he presumed that she could have returned to work at that time.

---

[13] Dr. Crenshaw stated that one could normally expect to recover from such an injury within six to ten weeks, but that Spann had not responded adequately to his treatments.

10

¶22. Dr. Goel, who practices family medicine at the Medical Clinic of Mississippi in Jackson, Mississippi, saw Spann on about six or seven occasions from March 2005 until November 2005. Dr. Goel stated that he quit practicing surgery about eight or nine years ago, and his principal practice is now family medicine. He also stated that he sees many car accident patients each week.

¶23. Dr. Goel diagnosed Spann as having a post-traumatic headache, chronic neck and back pain, and depression. He ordered MRIs on her neck, back, brain, and knee. According to Dr. Goel, these MRIs showed the following: (1) minimal bulging of the C5-6 and C6-7 discs in her neck; (2) L4-5 disc bulging in her lumbar spine; and (3) a torn meniscus in her left knee.[14] He further noted degenerative changes in her lumbar spine as well as arthritis. He recommended that she undergo arthroscopic surgery to repair the torn meniscus. Because of the meniscus tear, he assigned her a five-percent disability rating.[15]

¶24. Dr. Williams, who is a physical medicine and rehabilitation specialist at Methodist Rehabilitation Center in Jackson, Mississippi, treated Spann on four occasions from December 8, 2003, until February 3, 2004. In his initial examination on December 8, 2003, Dr. Williams noted that she had tenderness in multiple areas of her neck, back, and buttocks, and exhibited some weakness in the muscles around her left hip joint. Otherwise, she had

---

[14] The MRI of Spann's brain showed a small lesion, which Dr. Goel said could have been the result of a small hemorrhage in the past. He acknowledged that this hemorrhage could have been related to something other than the accident.

[15] The disability rating is discussed at greater length *infra* at pp. 17-19.

11

normal strength in her upper and lower extremities and a normal range of motion in her spine. He expressed skepticism concerning the spread of pain through so many different areas. For example, he could not explain how he could press on one part of her body, and she could experience pain in a totally different part as a result. His overall initial assessment was that "she had neck and low back pain with examination findings that were consistent with exaggerated pain behavior." He prescribed physical therapy and recommended that she discontinue the anti-inflammatories and muscle relaxers. He provided her a return-to-work excuse, recommending that she lift no more than fifty pounds infrequently, and no more than twenty-five pounds frequently.

¶25. Dr. Williams's assessment of Spann changed very little in her following visits. He conducted an electromyography (EMG) in January 2004, which revealed no significant nerve root damage. In February 2004, he once again described her condition as "nonspecific mechanical neck, mid, and lower back pain with significant exaggerated pain behavior . . . and a history inconsistent with anatomical pathology." He was also of the opinion that "secondary gain issues" were prominent. He explained "secondary gain issues" as presenting oneself with an illness or condition in order to receive attention and/or favorable treatment. At this point, he recommended that she return to work with no restrictions.

¶26. Dr. Wilkerson, a board-certified neurologist at Rankin Medical Center in Brandon, Mississippi, saw Spann twice in February 2004 and in March 2004, upon a referral from Dr.

Crenshaw. In March 2004, he reviewed her MRI[16] and EMG reports and believed the results of these studies appeared normal. His impression was that Spann had some "musculoskelatal discomfort" but nothing major. He believed that Spann had reached maximum medical improvement and could go back to work immediately.

¶27.   The trial occurred on December 12, 2005, and Spann submitted her first proposed findings of fact and conclusions of law on December 30, 2005. Spann then submitted an amended proposed findings of fact and conclusions of law—which contained a significant

---

[16] Dr. Wilkerson acknowledged that he did not review the actual MRI film and was not qualified to interpret such film.

difference—a few days later on January 3, 2006.[17]  The final judgment was entered almost

one year later on December 1, 2006, in which Spann was awarded the following damages:

| | |
|---|---|
| Past Medical Expenses | $26,875.53 |
| Future Medical | $20,000.00 |
| Lost Wages | $18,720.00 |
| Future Surgery | $20,000.00 |
| Pain and Suffering | $50,000.00 |
| Disability | $150,000.00 |
| | $285,595.53 |

The total award subsequently was reduced by $25,000, to account for the settlement with

Jenkins.  Thus, the final judgment totaled $260,595.52.

---

[17]  In her first proposed findings of fact and conclusions of law submitted December 30, 2005, Spann stated that Dr. Goel had assigned her a five-percent partial permanent loss of function to her left *knee*.  For support, Spann correctly cited Dr. Goel's deposition at page twenty-one, lines one through eight.  But in her amended proposed findings of fact and conclusions of law, filed just four days later, she asserted that Dr. Goel had assigned a five-percent *whole body* disability.  Spann once again cited Dr. Goel's deposition at page twenty-one, lines one through eight.  However, as set out below, this portion of Dr. Goel's testimony references only her left *knee*, not the whole body.

> [Spann's Attorney]:  And before we go to 3/21/05, let me back up.  Dr. Goel, in terms of her left knee meniscus tear, did you reach any conclusions as to a disability rating?

> [Dr. Goel]: Later on I gave her 5 percent partial permanent loss of function.

> [Spann's Attorney]: In her left knee?

> [Dr. Goel]: Yeah.

Later in the deposition, on page sixty-six, lines twenty through twenty-five, Dr. Goel assigned a five-percent disability to the body as a whole, without elucidation regarding the discrepancy.

14

¶28. In its opinion and order, the trial court found that "the expert opinions of Drs. Crenshaw and Goel are very persuading and should therefore be given more weight than the opinions of [Drs. Williams and Wilkerson]."[18] This comparative language is enough to indicate that the trial judge considered the testimony before it and merely acted within his province to weigh the credibility of witnesses. *Miss. Dep't of Pub. Safety v. Durn*, 861 So. 2d 990, 994 (Miss. 2003) (citing *City of Jackson v. Lipsey*, 834 So. 2d 687, 691 (Miss. 2003)).

¶29. Yet the City adamantly contests whether Dr. Crenshaw's and Dr. Goel's opinions were sufficient to justify Spann's damages. The City contends that Dr. Crenshaw is not board-certified and that he expressed some doubt about the extent of Spann's injuries; therefore, his testimony does not provide substantial, credible evidence to support her damages. As to Dr. Goel, the City insists that his testimony should be given no weight because it was not based upon sufficient facts or data. The City submits that, among other things, Dr. Goel did not review the records of Spann's other medical providers; did not see Spann until one-and-a-half years after the accident; knew that she had a lien arrangement with Spann's counsel for an outstanding bill of $3,882; and conceded that her lumbar pain was subjectively minimal.

---

[18] The circuit court's opinion and order refers to Drs. Williams and Wilkerson as the City's experts. In its brief, the City clarifies that these physicians were not hired by the City and were experts only to the extent that all treating doctors are experts.

15

¶30. We find that any challenges to the reliability of Dr. Crenshaw's and Dr. Goel's opinions should have been addressed in the circuit court via a **Daubert**[19] challenge. *See Smith v. Clement*, 2008 Miss. LEXIS 172, *8 (Miss. April 3, 2008) (citing **Poole v. Avara**, 908 So. 2d 716, 723 (Miss. 2005)) (trial judges bear the gate-keeping responsibility for the admission of expert testimony). At Dr. Goel's deposition, the City objected to his being tendered as an expert in physical medicine. At trial, however, the City raised no objection to the admission of Drs. Crenshaw's and Goel's depositions.

¶31. We find the testimony of Drs. Crenshaw and Goel sufficient to support the award of damages for past medical expenses, lost wages, and pain and suffering. Dr. Crenshaw's assessment of Spann did raise some questions as to the extent of her injuries. But he also clarified that, even if Spann may have embellished some things, this did not detract from the fact that she had experienced an actual injury. His testimony, considered on its own, may well fall short of constituting substantial, credible evidence. But when his testimony is considered alongside Dr. Goel's, there is substantial evidence. According to their testimony, Spann was diagnosed as having post-traumatic headaches, chronic neck and back pain, left-

---

[19] **Daubert v. Merrell Dow Pharms., Inc.**, 509 U.S. 579, 587, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Mississippi follows the modified **Daubert** standard, which requires the trial court to perform a two-pronged inquiry to determine whether expert testimony is admissible under Rule 702 of the Mississippi Rules of Evidence. **Miss. Transp. Comm'n v. McLemore**, 863 So. 2d 31, 38 (Miss. 2003) (citing **Pipitone v. Biomatrix**, Inc., 288 F.3d 239, 244 (5th Cir. 2002)). The trial court must first determine whether the testimony is relevant, then whether the proffered testimony is reliable. **McLemore**, 863 So. 2d at 38 (citing **Pipitone**, 288 F.3d at 244; **Mathis v. Exxon Corp.**, 302 F.3d 448, 460 (5th Cir. 2002)).

knee pain, and depression. Tests indicated: (1) minimal bulging of the C5-6 and C6-7 discs in her neck; (2) L4-5 disc bulging in her lumbar spine; (3) mild facet joint hypertrophy; (4) and a meniscus tear in her left knee. Because Spann had no prior history of neck or back pain, Drs. Crenshaw and Goel attributed her pain and arthritic changes to the accident.

¶32. The amounts for past medical expenses, lost wages, and pain and suffering are supported in the evidence and do not "shock the conscience" of the Court. The $26,875.53 for past medical expenses is equivalent to the total amount of all medical bills agreed by the parties as authentic and admissible at trial.[20] The award of $18,720 for lost wages was calculated by multiplying thirty-six weeks,[21] at forty hours per week, at $13 per hour.[22] The $50,000 amount for pain and suffering is supported by Spann's own testimony about the physical and emotional pain that she has suffered since the accident, as well as the testimony of Drs. Crenshaw and Goel. Because of the meniscus tear and continuing back pain, Spann also will endure future pain and suffering.

---

[20] Although the Agreed Stipulation as to the Admissibility of Medical Records and Bills states unequivocally that the City "reserves the right to argue against the reasonableness and necessity of the treatment," the circuit court's opinion states that the sum was agreed on by the parties as Spann's "reasonable and necessary medical treatment and bill." The City does not challenge this discrepancy, but contests the award of damages *in toto*.

[21] The circuit court awarded lost wages from March 7, 2005, until December 12, 2005, which was the date of trial. The circuit court apparently chose to begin its calculation on March 7, 2005, because that was the date on which Dr. Goel first examined Spann and declared her to be temporarily totally disabled.

[22] Spann testified that she was paid $13.92 per hour at the time of the accident. The trial court, however, based its calculation on $13 per hour.

¶33.    However, we do not find substantial, credible evidence to support the trial court's $20,000 award for future medical expenses, its $20,000 award for future surgery, or its $150,000 award for disability.  Although Dr. Goel testified that Spann would likely continue to experience ailments, there is no testimony establishing future medical expenses, other than the equivocal testimony regarding future surgery.  The only support for $20,000 for future surgery comes from the following exchange:

> [Spann's Attorney]: Within a reasonable degree of medical certainty, do you have a reasonable estimation of what the cost would be to surgically repair the meniscus tear?
> . . . .
>
> [Dr. Goel]: *Well, I would guess around $20,000.  I don't know for sure*.
>
> [Spann's Attorney]: Okay.
>
> [Dr. Goel]: It's the hospital charges.
>
> [Spann's Attorney]: But based on your background as a surgeon, a reasonable estimation would be $20,000?
>
> [Dr. Goel]: *This is my guess*.

(Emphasis added).

¶34.    Considering that Dr. Goel had not practiced surgery for eight or nine years, we find his mere "guess" insufficient to establish substantial, credible evidence to support the $20,000 award for future surgery.  *See **Catchings v. State***, 684 So. 2d 591, 598 (Miss. 1996) (expert medical testimony must evince some level of certainty).  Our finding does not imply that Spann did not suffer a torn meniscus.  Even though no other testifying physician detected this injury, there is nothing in the record to refute Dr. Goel's finding.  But the fact that such

18

an injury existed does not lessen the need for credible evidence to support the costs associated with treatment and/or repair.

¶35. The $20,000 for future surgery and the $150,000 for disability are interrelated. Because of the torn meniscus and the resulting loss of function to her left knee, Dr. Goel assigned a five-percent disability rating to Spann. According to the American Medical Association's *Guides to the Evaluation of Permanent Impairment*, an impairment evaluation should include "a comprehensive, accurate medical history; a review and summary of all patient records; and a comprehensive description of the individual's current symptoms and their relationship to daily activities," as well as a thorough physical examination and review of all the relevant tests. Robert D. Rondinelli, M.D., Ph.D., et al., *Guides to the Evaluation of Permanent Impairment 5* (American Medical Association, 6th ed. 2008). The only support in the record for Dr. Goel's assignment of a five-percent loss of function was his notation of a mild restriction in the range of motion of her left knee, chronic pain, and her inability to put her full weight on the left knee. He further advised Spann to see an orthopedic surgeon, but she said that she could not find one. There is no testimony, report, or other evidence to support that Dr. Goel engaged in a comprehensive evaluation. Tellingly, he acknowledged his own uncertainty as to Spann's physical limitations. When asked whether Spann would be able to return to work, he stated that he did not believe so but added that "[s]he needs to be evaluated by [an] orthopaedic surgeon . . . and then we can come to that conclusion."

¶36. Because of the lack of evidentiary support for Dr. Goel's findings, we find no substantial, credible evidence to support the $150,000 for disability. *See* Miss. R. Evid. 702 (expert testimony must be the product of reliable principles and methods.)

## CONCLUSION

¶37. We affirm the circuit court's finding that the City was solely liable for Spann's injuries. Because we find no substantial, credible evidence to support the award for future medical expenses, future surgery, or disability, we reverse the judgment and remand this case to the trial court which is directed to enter a final judgment in the amount of $70,595.52.

¶38. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**CARLSON, P.J., RANDOLPH, LAMAR AND CHANDLER, JJ., CONCUR. GRAVES, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, KITCHENS AND PIERCE, JJ.**

**GRAVES, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶39. Because the damages awards for future surgery and disability are supported by the evidence, I dissent in part. As stated by the majority, this Court applies the substantial evidence standard when reviewing the findings of a judge sitting as the factfinder. *Donaldson v. Covington County*, 846 So. 2d 219, 222 (Miss. 2003). That is, this Court will affirm the findings of the trial judge if they are supported by substantial, credible, and reasonable evidence. *Delta Reg'l Med. Ctr. v. Venton*, 964 So. 2d 500, 503 (Miss. 2007); *Donaldson*, 846 So. 2d at 222. When reviewing awards for damages, this Court will affirm

the award, unless it is "so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable, and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption." *Delta Reg'l Med. Ctr.*, 964 So. 2d at 506 (citing *United States Fid. & Guar. Co. v. Estate of Francis*, 825 So. 2d 38, 47 (Miss. 2002)).  This Court has held that "[t]he award is not to be set aside unless it is entirely disproportionate to the injury sustained." *Delta Reg'l Med. Ctr.*, 964 So. 2d at 506 (citations omitted).  Additionally, "the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line; for they have no standard by which to ascertain the excess." *United States Fid. & Guar. Co.*, 825 So. 2d at 47.

¶40.    As a result of the accident that occurred on October 21, 2003, Spann suffered serious injuries, including a tear to the meniscus in her left knee.  Based on the expert testimony presented, the trial judge concluded that it would cost approximately $20,000 to surgically repair the tear in Spann's meniscus and that Spann had suffered a five-percent loss of function in her left knee and her entire body.  Accordingly, the trial judge awarded Spann $20,000 for future surgery and $150,000 for her disability.

*Award for Future Surgery*

¶41.    There is substantial evidence to support the trial judge's finding that Spann had a tear in her left meniscus and that the surgery to repair it would cost approximately $20,000.  Dr. Goel testified that Spann complained of pain in her left knee.  He ordered an MRI, which revealed a tear in the medial meniscus in her left knee.  Dr. Crenshaw testified that Spann presented with a limp because of an injury to her left knee.  Dr. Goel also testified that Spann

21

continued to suffer from knee pain during the period in which he treated her and that the meniscus tear needed to be surgically repaired by an orthopedic surgeon. He added that Spann had not been able to afford an appointment with an orthopedic surgeon. Dr. Goel estimated that the surgery to repair the meniscus would cost approximately $20,000. This estimate was based on Dr. Goel's past experience as a surgeon.[23]

¶42. The majority concludes that Dr. Goel's "mere 'guess'" does not constitute substantial, credible evidence in support of the trial court's finding that the surgery would cost approximately $20,000. Maj. Op. at ¶ 34. The majority finds that Dr. Goel's testimony on this point did not evince the requisite level of certainty. Maj. Op. at ¶ 34. However, Dr. Goel testified that his opinion was held to a reasonable degree of medical certainty. Also, his estimate for the cost of the meniscus surgery was unrebutted. The City of Jackson did not present any evidence that such a surgical procedure would cost less than $20,000. Although Dr. Goel may not have practiced surgery for eight or nine years, that is not necessarily an indication that he is any less aware of the cost of a meniscus surgery. Furthermore, assuming *arguendo* that Dr. Goel's estimate for the surgery is outdated, the cost has most likely increased in the past eight or nine years, further justifying the trial court's award for future medical expenses. Dr. Goel's testimony constitutes substantial, credible evidence in support of the $20,000 award for future surgery. Accordingly, this award should be upheld.

---

[23] Dr. Goel testified that he could no longer perform surgeries because of an injury to his hand, but he remains board-certified in surgery.

*Award for Disability*

¶43. There is also substantial evidence to support the trial judge's finding that, as a result of the accident, Spann is now disabled. Dr. Goel testified that Spann had a disability rating of "5 percent partial permanent loss of function" to her left knee and her body as a whole. He stated that, in his medical opinion, she was unable to work because of her knee injury, and he agreed that she was "temporarily totally disabled." The majority states that there is no evidence in the record demonstrating that Dr. Goel performed a comprehensive evaluation of Spann to support his conclusion that she suffered a five-percent loss of function. Maj. Op. at ¶ 35. It is worth noting that Dr. Goel treated Spann over the course of nine months, during which period, Spann visited him seven times. In comparison, Dr. Wilkerson, a medical expert for the City, only met Spann once when he interviewed her for approximately thirty minutes. The City's other medical expert, Dr. Williams, saw Spann four times over the course of three months.

¶44. The record contains Dr. Goel's notations following each of Spann's visits. The notes indicate that Dr. Goel concluded that Spann had suffered a five-percent loss of function on her fifth visit. The notes also indicate that, over the course of the first five visits, Dr. Goel performed a physical examination; tested the range of motion of different body parts; monitored her pain levels; ordered and reviewed MRIs of her neck, head, spine, and left knee; prescribed medication; and counseled her about physical therapy and surgery for her knee. The note detailing Spann's fifth visit with him states, in relevant part:

23

[Patient] at this point needs surgical intervention of [sic] the left knee, for her cartilage . . . . [Patient], if she does not have surgery, she obtained maximum medical improvement, and has possible loss of function in the entire body especially in areas of the left knee. The [patient] has mild restriction of range of motion of the left knee and keeps a [sic] chronic pain. [Patient] is not able to put full weight on the left knee. Therefore, she is [sic] 5% loss of function as the result of the left knee. . . . There is possible 5% loss of function of the entire body as a result of the left knee.

¶45. The documentation of Dr. Goel's treatment of Spann over the course of nine months demonstrates his basis of knowledge for credibly finding that she suffered a five-percent loss of function as a result of the accident.

¶46. The majority also quotes Dr. Goel's statement that Spann needed to be evaluated by other specialists before concluding that she could not return to work. Maj. Op. at ¶ 35. This concession does not detract from the fact that Dr. Goel assigned Spann a five-percent disability rating, since such a disability rating might not prohibit a person from returning to work. Furthermore, the testimony of Dr. Williams and Dr. Wilkerson stating that Spann could return to work full-time is not necessarily inconsistent with a five-percent disability rating either. To the extent that there were inconsistencies between the expert testimony presented by the City and Spann concerning her impairments, this Court has held that "[w]here there is conflicting evidence, this Court must give great deference to the trial judge's findings." *Thompson ex rel. Thompson v. Lee County Sch. Dist.*, 925 So. 2d 57, 62 (Miss. 2006) (citing *City of Jackson v. Lipsey*, 834 So. 2d 687, 697 (Miss. 2003)).

¶47. In this case, the trial court heard the expert testimony from both sides and found Dr. Goel's testimony more persuasive than that of the City's medical experts. Dr. Goel testified

24

to a reasonable degree of medical certainty that Spann suffered a five-percent loss of function to her entire body and was, therefore, disabled. His testimony constitutes substantial, credible evidence in support of the trial court's finding that Spann was disabled. In turn, this finding of fact supports an award of damages for disability. The award of $150,000 for Spann's disability is not so excessive, extravagant, or outrageous that this Court should reverse the award. Therefore, it should be affirmed.

¶48. The trial judge properly relied on the unrebutted testimony of Dr. Goel to find that it would cost $20,000 for Spann to have her torn meniscus surgically repaired. The trial judge also properly relied on Dr. Goel's testimony to find that Spann suffered a five-percent loss of function. The award of $150,000 for Spann's disability is not excessive beyond all measure or flagrantly outrageous and extravagant. Therefore, the trial judge's order granting Spann a total award of $260,595.52 should be affirmed.

**DICKINSON, KITCHENS AND PIERCE, JJ., JOIN THIS OPINION.**